Morning, Your Honors. It pleases the Court, my name is James Oberman and I represent the appellant Donna Morgan. Your Honor, I think that there was a lot of briefing on this case, but what the case boils down to is a fairly simple issue from my client's point of view. She only seeks to be compensated for her injuries and for her husband's terminal illness that was caused, in our view, by the negligent operation of a shipyard. It just so happens in this case that instead of a government contract shipyard or some other shipyard, it was a United States Navy shipyard. The case does not challenge the Navy's choice of asbestos and asbestos-containing materials to build ships or to insulate ships. It does not challenge any design decision that was made by the government in building ships. It does not challenge any design decision that was made in building the shipyard. The only challenge that is made here is to the negligent operation of the shipyard, which is not in any way a unique governmental function. There was no decision here that is ---- But the way that a shipyard is run involves, you know, thousands of little decisions. There's all kinds of decisions that have to be made. What kind of an operation are you running? Are you running a gold-plated operation? Are you running sort of a sloppy operation? I mean, these are decisions that there are all kinds of decisions that would go into running a shipyard. That seems like quite a generalization. Well, and that's true, except that the same decisions arise that are at issue in this case in the operation of any shipyard or, indeed, any premises. The issues actually here are not actually all that distinct from those that occur at industrial sites or oil refineries where asbestos-containing insulating materials were used. Right, and if you were suing those parties, you probably would have a good claim. But you've got a discretionary function exception that you're going to have to get over in order to bring suit against the United States. Well, and the point is that under the discretionary function exception, the question is whether the government chose between competing objectives and made decisions based on policy choices. And this Court's decision, particularly the Wisnant decision of this Court, which involved mold in a commissary and exposure to mold by an employee of a government contractor, apparently the seafood contractor in that case, the Court held that was a safety and health decision that was not related in any way to any government policy or discretionary function. In our view, except for the fact that the toxin involved there was mold rather than asbestos, that case is not in any meaningful way distinguishable from this case. Judge Bonitas has a question. I was just going to ask you, though. In Wisnant, there were existing regulations that required the government to do something. Right? What are the regulations, the mandatory regulations that the government was required to adhere to in this case? What is your contention that the government did not do that it was required to do? Well, there are two points on that. I mean, we have two alternative theories. The first point is that, in fact, there was a manual of safety rules in effect that required that air-fed or dust-type respirators be worn whenever amicite or insulating materials were being handled. Okay. But at the time, at the time, there were no insulating materials being handled. That process had already been completed, as I recall. No, Your Honor, that's a disputed issue of fact. I see. That's a disputed issue of fact. That's the government contends that that was the case. But, in fact, we submitted a declaration of John Hillstrom, who was an insulator, directly involved in the insulator at the primary ship at issue here, the USS Wright, and also a deposition testimony of another insulator, Richard Harvey. And Mr. Harvey, in particular, both of these gentlemen testified that insulators were aboard the ship throughout the ship's conversion. In fact, according to Mr. Harvey, the main insulation work occurred at the end of the conversion. The government actually concedes that Dennis Morgan was aboard the ship at the end of the conversion. These two insulators testify that most of the insulation work occurred actually at the end of the conversion. Mr. Harvey testified in his deposition that, at all times, there were at least 15 insulators aboard the ship during their own work. Now, Dennis Morgan was an electrical engineer working for Sylvania on communications equipment, didn't know what asbestos was, knew that there were a lot of folks around and a lot of dust and debris around. In fact, it's conceded by the government's experts that maybe bases such as this were veritable fonts of asbestos. But the people who actually knew what was going on with the asbestos-containing material, that was not Dennis Morgan. That was the insulators whose testimony we did submit. And it was error on the part of the trial court, in our opinion, to just overlook that and not even address it in its order when these insulators' testimony at least raised a reasonable inference that all of this asbestos work was occurring, that the dust was permeating the ship. In fact, according to Mr. Hillstrom, the right, in particular, had been mothballed. And so that was a particularly dirty job, where the asbestos-containing insulation was removed from the ship in wheelbarrows and dumpsters. I mean, we're not talking about a small amount of asbestos-containing material here. And this is mesothelioma, actually, and relatively small doses are known to cause a disease. But what is at issue here are literally tons and tons of asbestos-containing materials. And on that point, there is at least a triable factual issue as to whether Dennis Morgan came into contact with that. Well, let me ask you a question, though. In a shipyard like this, there are probably a zillion different hazards that one might be able to identify. Wouldn't the government have to make a policy decision as to what are we going to warn about, what are we not going to warn about, when are we going to warn about it, when are we not going to warn about it? Don't they have to make those decisions all the time? Your Honor, respectfully, I suggest that the panel that decided the WisNet case actually had it correct. When you're talking about the government operating as a premises owner here and when you're talking about an issue relating to negligence in the maintenance and operation of the premises, what Your Honor has described really is not the issue. To quote from WisNet, every slip and fall, every failure to warn, every inspection and maintenance decision can be couched in terms of policy choices based on allocation of limited resources. There's a very real danger that if the discretionary function exception is extended to that situation, is extended to this situation, it swallows the entire Federal tort. Well, there is an exception for known safety hazards. The question was in 1963, what's the best evidence you have that this was a known safety hazard to which the Navy would have been apprised? Well, there's a lot of it in our brief. Yes. I'll give you one. In 1943, the Navy itself was warning its contract shipyards that breathing asbestos dust was toxic and that it was a known hazard. That was in 1943. By 1955, it's conceded by the government's own expert, Dr. Hardin, that it was known that asbestosis and lung cancer were caused by inhaling the fiber. It was known in the 1940s and 50s that household members of workers who brought asbestos dust home on their clothing were breathing it and were becoming sick. It was also known at that time that people who weren't even working with the material, clerical workers and plants, were getting sick just because through secondary exposures to the dust. Also, people who happened to live near an asbestos mine or factory were getting ill. This was all well known. And beyond that, there's the Wagner research. By 1960, Dr. Wagner published research where there were 33 cases of pleural mesothelioma, the disease specifically at issue here, attributed to exposure to asbestos. And that's important and can't be overlooked. But the general nature of the harm and the fact that cancer was being caused by breathing the dust, that was not only knowable, but that was actually known by the government at that time. We're down to about five minutes. Do you want to save some time for a bottle? Yes. Yeah, very good. Thank you. We have some government. Yes, Your Honor. David Fishbach for the United States. The district court correctly concluded that this case must be dismissed under the discretionary function exception of the Federal Tort Claims Act. It's well settled that tort suits, including those involving national defense matters, are barred by the discretionary function exception if the United States has not violated a pertinent, specific, and mandatory self-imposed obligation, and if the government's activity complained about is susceptible to policy determinations. Now, Mr. Morgan worked at the Puget Sound Naval Shipyard in areas that did not deal with high-dose exposures. You would agree, though, that mesothelioma is a disease that's only caused by asbestos, wouldn't you? Pretty much. There may be some other causes, but most times it appears to be caused by asbestos. We have no dispute about that. We do not dispute that. So do you – and you don't have any alternative causal hypothesis on how he acquired this disease, right? No, we don't. But this case is not about causation. No, I'm just setting the groundwork before. Right, right. This case is not about causation, and it's also not about negligence, as this Court has repeatedly found and held that issues of negligence are irrelevant to the discretionary function exception analysis. A plaintiff relies heavily on the Wisnett case, but the plaintiff neglects to point out that Wisnett specifically said at page 1184 of the decision that, quote, In Wisnett, you had one discreet problem. There was a mold problem in the commissary. The panel saw that as being a single discreet problem that the government knew about and that it simply ignored, and consequently, it could not be susceptible to policy determination. But the Wisnett – Would your answer be different if this case were brought based on events that occurred, say, in 1995 as opposed to 1963? It might. One would have to see what kinds of rules were in place, certainly. Well, no, in terms of the known safety hazard exception, I mean, one can argue that about the state of knowledge in 63, and plaintiff has made a, you know, very good showing that there was a substantial body of literature before that, but it's hard to say in 1995, for example, that – Well, of course, that is not this case. Well, I'm asking – that's why I have a little hypothetical. I certainly would not conceive that for the reasons set forth in this Court's decision in reconsolidated atmospheric testing. You don't think asbestos is a known safety hazard? It is a known safety hazard. It is different levels of potential problem depending on the dose. Excuse me. Let me interrupt you there. Is that why C-8, the regulation or the recommendation C-8, talks about handling – those who are handling insulating materials or who are working in dusty processes are to wear the respirators but not others who might have a lesser exposure, perhaps? Is that why C-8 was in there? That is absolutely correct. Now, we dispute the proposition set forth by plaintiffs that that – that those rules were mandatory, but even if they were mandatory, they would be irrelevant to this situation because Mr. Morgan, by his own testimony, did not see people doing insulation work, did not see people working with asbestos, did not see extremely dusty conditions, and in light of those factors, it is plain that Mr. Morgan was outside the scope of what – what warnings and what kinds of concerns that the Puget Sound Naval Shipyard had in 1963. But I would like to get back to Judge Thomas's question. In reconsolidated atmosphere of testing, the United States knew that exposure to radiation in those above-ground testing was a – was – could be a hazard and that some people might become ill as a consequence. Because of all the different factors that were involved in – in the testing, the Court determined, affirming District Court Judge Schwarzer, that decisions about what to warn about, how much to warn about, whether to warn at all, were protected by the discretionary function exception. This – and the reason for that goes back to the origins of the Federal Tort Claims Act. You know, there was no waiver of sovereign immunity in tort against the United States in 1946. When Congress enacted the limited waiver of sovereign immunity, one thing it was very concerned about was that it didn't want individual district court judges making policy decisions through tort suits. And that's why the exception is in there, and that's why the Supreme Court, in the last three – actually, in every case that's been before it, has made it clear, and it's become more and more specific as this litigation goes on, that these sorts of policy decisions – and here, in essence, to use your example, Judge Thomas, if you had a situation like that in 1995, it is very – it is certainly possible – and without seeing all the facts, you wouldn't know – but it's very possible that if there's a determination, basically a triage, what are we going to focus on and what are we not going to focus on? Can we focus on every single hazard, or are we going to focus on the ones that are most likely to create problems knowing that there are limited resources? Well, the reason with this specific hazard that I focus on is that the United States, alleging that there's no known safe limit of asbestos, that W.R. Grace through the 1970s didn't warn and shouldn't have warned, and it was a criminal violation for them not to do so. And it alleged, and affirmatively – you're familiar with it – it affirmatively alleged that the only cause of mesothelioma is asbestos. And so when you say in 1995 we could bring resources to bear and make allocations, I find that flies in the face of the allegations that the United States is making in criminal charges following that case. Well, yeah. You're referring to the Libby situation. Yes. And in the Libby situation, by the time these issues came up – and this is long after the issues in Libya. I'm not talking 19 – I'm talking hypothetical 19. Okay. Well, you're talking then – then at that point, there may be – again, that's a private case, and criminal issues can be significant. But our point is – and this is the point about the law and how the law develops, and this is – and Judge Brothering correctly found – that decisions about how to weigh the need in this case to get the ships built, the ships renovated for national defense in a prompt and efficient manner where there are many, many health hazards and you've got to prioritize. There are dozens and dozens of health hazards in a shipyard. The decision on how to prioritize which things you're going to focus on is within prong two of the discretionary function. So again, I'm pushing you to the extreme of the hypothetical. Yeah. But if the United States engaged in the same activity that alleges W.R. Grace did, you're saying that's – it could immunize itself on the basis of a policy choice because it falls within the discretionary function. That is not impossible. And let me explain also. Let's say that – I can't imagine what happens in an extreme hypothetical, but let's say that some private company on its own somehow was allowed to do above-ground nuclear testing and they didn't warn anybody about radiation hazards. They can be liable in tort. But the United States – Your theory is not the United States, even under the most extreme hypothetical that I've given you. Well, no, there are – Well, you gave me one more extreme, I guess. That's a very extreme hypothetical. This case, however, in this sort of situation, is really rather straightforward. It's important to understand in this case that all of the evidence – but basically what plaintiffs seek to do here is to make an equation between any exposure to asbestos is the same. And that was known in 1963 and in the years thereafter. All of the testimony that they present simply talks about high-dose exposures, the kinds of exposures that were relevant to the respirator issue in C-8. Let me interrupt you for just a second. I hate to do this, but counsel pointed out that some of the declarations indicated that there was insulation that was going on at the time that Mr. Morgan was working on the ship. If that is true, doesn't it become an issue of fact to decide whether or not that process that was going on at the time would qualify as a dusty process that is described in C-8? The reason that would not hit – that would not reach the discretionary – that would not interfere with what Judge Burrell determined is that the question of what is a dusty process is subjective. It is not specific. Under the standard discretionary function exception analysis, the rule must be mandatory, which this one was not, but even if it was, also has to be specific. And here you're talking about very, very subjective determinations. How much dust in 1963 do you need to have to do what? And that's also unstated in the – in the manual. Let's just make a case that – a very strong case that Mr. Morgan was exposed to asbestos when he was at the shipyard. That's not the point. The point is that the United States knew about hazards to high – people who were exposed in high-dose situations. It did not – its understanding – and this is undisputed, and indeed, plaintiffs' allegations that the industrial hygienist Carl Mangold said to the contrary is simply false. Indeed, I would point out to the Court at – let me go back to 2018 and also at excerpts of Record 30 through 31, Mr. Mangold said that as soon as the low-dose exposures, that wasn't something they were considering back during that time period. So there was no knowledge by the Navy at that time that low-dose exposure could be a problem. But even if there was, it would still be within the discretionary function exception to focus its industrial hygiene and safety matters on the big picture, on the big issues, and not on the kinds of exposures that might – might cause a problem for a very, very small number of people. But again, taking it back to the facts of this case, all of the testimony that they provide goes to the general question of, was asbestos a danger? Could asbestos dust be dangerous? Yes, it could be to people working in – working around it all the time, year after year. Well, and unquestionably, it's dangerous to people who are exposed, as counsel points out, by even dust brought home. I mean, that's undisputed in hindsight. We know that now. Yes. But remember, there's no strict liability against the United States, and there's no negligence – the issue of negligence is – I'm just responding to your factual question. No, I understand that. But the point here for this case is whether the United States government's judgments about how to handle safety matters at Puget Sound Naval Shipyard in 1963, whether those judgments should have been second-guessed by Judge Burrell. And he correctly found, no, they should not be. They had to prioritize among many, many safety concerns and the concern of getting these ships done – renovated quickly and promptly. And the judgments that it made in that respect are not within the waiver of sovereign immunity and tort. Now, just because someone can't recover in tort against the United States doesn't mean they don't have any remedy against the United States. For example, in the Dale Hyde case, the first discretionary function exception case before the – before the Supreme Court, discretionary function exception barred the suit, and subsequently, Congress passed – passed private relief. In the Allen case out in the Tenth Circuit, the above-ground nuclear testing, those – those cases were – were tossed out because of discretionary function exception, and Congress did act in the way that would have been the only remedy prior to 1946. The question here is a question of forum. Where do these – should these complaints – who – who decides, really, is what the question is. And when there is policy involved, when the matters are susceptible to policy determination, then the United States is – cannot – cannot be sued in tort. I just want to point out a few things to make it – just want to clarify a few things before I make – make certain that the – that it is clear. One is that the government's understanding in 1943 – let's go through our brief and we lay these things out – there was concern in 1943. By the end of World War II, the government determined, based on its studies, that asbestos was not a problem because of the studies they had done. Now, it turned out those studies were flawed, and a lot of it had to do with asbestos companies holding back information they had about latency periods, but the point was that the government didn't know in 1946. As the years went on, into the 1950s, there started to be some concern that maybe there could be a problem with the high-dose people. And by the late 60s, the concern began to get – get greater after the Selleckoff studies in 1964. Mr. Mangold testifies at page 3031 of the excerpts of the record in the litigation 25 years old they pulled up involving the high-dose exposure type situations. He was asked, well, what about cancers? And he says, well, you know, we didn't know about that until 64, 65. At the excerpts of record – the supplemental excerpts of record 17, 18, he's asked, well, after saying yes, we knew about high-dose exposures were a real problem, he was then asked, well, what about low-dose exposures? And he says, well, that wasn't something we were considering. The fact that there were some studies at different places around the world in the pre-Internet days that low-dose exposure could be a problem did not create knowledge in the Navy and did not undercut the discretionary function exception analysis. At most, that might go to a negligence argument, and I don't believe would succeed anyway. Indeed, the – in the Dubey court, Dubey decision, which plaintiffs rely on heavily while often misstating what has happened in the subsequent years of litigation surrounding the Dubey doctrines, but in that case itself, the First Circuit affirmed, did not disturb the district court's ruling that government – that the government could not be negligent with respect to bystander asbestos exposure because, at least in the period prior to 1964, because the government didn't know and had no reason to know. But if I'm understanding that the logical extension of your argument, you say, even in 1995 or so, didn't make any – your argument is it doesn't make any difference that the United States wouldn't be held liable anyway. I would – I would suggest that in 1995, there's a very good chance. I haven't – we haven't had cases involving that, so I don't know what the regulations were. But I suspect there were regulations in place that, if something like that had happened, there probably would have been a violation of those regulations. And if there had been a violation of the regulations, then the United States would be liable in tort. It's really about the safety hazard exception. But really, the – what's – and, again, one can debate what should have been done in 1963, but as I understand the argument, we wanted a warning or a respirator, which is – neither of which is particularly expensive. Well, number one, respirators for people not working near asbestos, particularly in those days and probably up until very, very recently, would have been considered absurd back then. The – and the question of warnings, well, this circuit has made it very, very clear that questions of warnings in national defense, particularly in national defense cases, but also in non-national defense cases, are matters of – of policy-based discretion because there are issues surrounding the warnings. The Moss case out of the Seventh Circuit, which we – which we discussed, points that out very, very clearly in what – the considerations that would be involved in that. And in Reconsolidated Atmospheric Testing, this Court made it very clear that these issues of warning, whatever a judge might believe the government should have done, are policy – are policy calls. For example, let's say in 1963, the United States learned about a couple of the studies that low-dose exposure could be a problem, and it warned everybody. You know, if you're 20 years, you may die from mesothelioma. Now, what would that – what could that have done to the ability to get the ships made? Well, I think to ask the question is to answer it because you can't make – at that time, you could not have made the shipyard completely asbestos-free. The resources that are now put in now that we have much greater knowledge about dealing with asbestos are extremely expensive, slow things down considerably, but this is based on the knowledge that we have now and the way we act. But to say that – to look – to go back, you know, go back in time and impose what we know now as to what would be a susceptible policy determination of what was known then really doesn't fly. But the main point is that you've got triage. And you've got a lot of hazards. You prioritize what you're going to focus on, what you're not going to focus on. There are upsides and downsides to warnings. There are upsides and downsides to trying to make the place as free as asbestos as possible or maybe even completely asbestos-free. But those are all policy judgments that Congress has committed to the executive branch, after the Congress, not to the courts. My questions have taken you over your time. Thank you for your argument. Okay. Thank you. Your rebuttal. Yes, Your Honors. The fact is that there's no evidence that the government or the Navy made any policy choice at the Puget Sound Naval Shipyard. The fact is that no one – How can that be, counsel? Is it a policy choice just to ignore the problem? Well, I mean, I don't want to get into philosophy, but I think that – It was clear that the government had some concerns about asbestos for some time. There have been a number of studies about that. And it's clear from the one little training manual that we do have that they had some concerns and wanted people, especially those who were dealing directly with asbestos, to use some safety equipment. But there doesn't appear to be anything in there that says – We're telling you right now, if you're going into an area that's been marked off as an asbestos area, then you must do the following items. No. What the author of the safety manual wrote is that air-fed or dust-type respirators were required for handling ammosite or insulating materials. It doesn't say you need to see dust. It doesn't say there needs to be a lot of dust around. It just says – Was your client handling any of those materials? Well, my client was in proximity to those materials. But it doesn't say anything about people in proximity. It's the people handling, right? I'm answering the question, Your Honor. It did. The point is that Richard Harvey and John Hillstrom testified that all of this asbestos insulation work was, in fact, going on. Richard Harvey, in particular, said he was unaware of any requirement, the requirement that was in this manual, to wear respirators. He never wore one, never saw anybody at the yard wearing them. Had insulators been wearing respirators, that would have alerted my client to the fact that there were toxins in his immediate working environment, and he needed to do something about it to protect himself. Judge Benitez has a question. That did not happen. I'm sorry, but that's not really the issue. The issue is whether or not the regulation required that Mr. Morgan wear a respirator, right? That's really the issue. Respectfully, I disagree with that because the fact is that the requirement that was in place was not followed. The insulator said that, that that was not followed. Had it been followed, that actually would have provided protection to Mr. Morgan because he would have been notified that there was toxic material or toxic work happening in his proximity. What you've really done, then, is convert this into sort of a failure to warn case. Your client would have been, under your reading, as I understand your reading of the regulation, your client would not have been required to wear a mask of some kind. What you're now telling us is that if the people who had been required to wear masks had been wearing masks, your client then would have been on notice and he might have taken some steps to prevent his exposure to the asbestos in the area. Your Honor, I'm not conceding. I don't want to be misconstrued. I'm not conceding that the regulation would not have required him to wear a mask. As I stated before, he was an engineer and did not recognize asbestos or asbestos insulation materials. The insulators obviously knew what they were working with. I'm not conceding that there's a lack of evidence that, in fact, these materials were being used in his presence. We believe that was occurring, and we believe that, under that reading, he would have been required under this regulation to wear a respirator. And obviously, if he had been wearing a proper respirator, that would have protected him. You're just making a common-sense warning argument that when you see everybody else around you wearing a respirator, you start thinking that maybe you should. But let's get back, I think, to the regulation. And I think the question that Judge Bonita has raised earlier, what's the best evidence you have in the record that he could have been considered to work in a dusty trade and, therefore, that it would have been a mandatory regulation? The best evidence we have are the declaration from John Hillstrom, who was the insulator, and also, more importantly, the deposition testimony of Richard Harvey concerning all of the asbestos insulation work that was occurring on the ship and that was creating dust that literally permeated all of the major spaces on the ship where Dennis Morgan undeniably was. And if this was occurring in his presence, as we believe the evidence supports a fair inference, we believe that this regulation would have required that he wear a respirator. And how do you respond to Mr. Fishback's argument that the regulation is so vague that it can't possibly form the basis of liability in this case? Well, the government can't have it both ways. There's either a regulation where the government made a choice how to treat asbestos or the government didn't make a choice, in which case it is a failure-to-warn case and the government should have at least posted signs stating asbestos hazard warning. None of that was done. The fact is that it was not only known, as we contend, but it was at least knowable, because this is what was left out of counsel's argument, that low-dose exposures caused illness. And it was known because there were cases in the 40s and 50s of people who nearly lived in proximity to an asbestos factory or an asbestos mine and who were getting ill, and there were people who merely lived in a household where somebody worked near asbestos and were getting ill in that way. Any further questions? Thank you, counsel, for your argument.
judges: Thomas, Bybee, Benitez